**2022 WI App 54**

# COURT OF APPEALS OF WISCONSIN
# PUBLISHED OPINION

Case No.:        2020AP2076

Complete Title of Case:

**NEIL KLOSTERMAN,**

**PLAINTIFF-APPELLANT,**

**V.**

**SCHOOL DISTRICT OF OMRO,**

**DEFENDANT-RESPONDENT.**

| | |
|---|---|
| Opinion Filed: | September 28, 2022 |
| Submitted on Briefs: | December 1, 2021 |
| Oral Argument: | |

| | |
|---|---|
| JUDGES: | Gundrum, P.J., Neubauer and Grogan, JJ. |
| Concurred: | |
| Dissented: | Grogan, J. |

Appellant
ATTORNEYS:        On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Brian D. Hamill* of *Dempsey Law Firm, LLP*, Oshkosh.

Respondent
ATTORNEYS:        On behalf of the defendant-respondent, the cause was submitted on the brief of *William E. Fischer* of *Von Briesen & Roper, S.C.*, Neenah.

COURT OF APPEALS
DECISION
DATED AND FILED

September 28, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2020AP2076**

STATE OF WISCONSIN

Cir. Ct. No. 2020CV182

IN COURT OF APPEALS

---

NEIL KLOSTERMAN,

    PLAINTIFF-APPELLANT,

V.

SCHOOL DISTRICT OF OMRO,

    DEFENDANT-RESPONDENT.

---

APPEAL from an order of the circuit court for Winnebago County: BARBARA H. KEY, Judge. *Affirmed*.

Before Gundrum, P.J., Neubauer and Grogan, JJ.

¶1 GUNDRUM, P.J. The Omro School Board became concerned with then middle-school teacher Neil Klosterman's physical contact with male middle-school students and his refusal to avoid such contact in the future, as reported by a police/school safety officer who confronted Klosterman about it. The board

ultimately banned Klosterman from School District of Omro (District) property and has maintained that ban even after Klosterman resigned from his teaching position.

¶2 Klosterman's legal challenge to the ban fell flat before the circuit court as it granted summary judgment to the District. On appeal, Klosterman insists the board lacks legal authority to impose and maintain such a ban and further insists that even if the board did have such authority, no reasonable grounds were present in this case for the board to impose such a ban against him. We disagree with Klosterman and conclude that the board had and reasonably exercised the authority to impose the ban in this case.

### *Background*

¶3 While still a teacher in the District, Klosterman was placed on administrative leave after repeatedly engaging in physical contact with middle-school boys on District property and, according to Police/School Safety Officer John Peeters, expressing that he would not stop engaging in such contact. In conjunction with the leave, the District banned Klosterman from District property, and it continued that ban after Klosterman eventually resigned his teaching position. On multiple occasions, Klosterman sought to have the ban lifted, but the board has remained steadfast in maintaining the ban.

¶4 An affidavit by the superintendent, and exhibits attached thereto, identify the reported conduct of concern. Peeters wrote a report related to his District-requested investigation and first-hand observations of Klosterman's conduct, which report is included with the affidavit and exhibits. The report indicates the following.

¶5 Spring 2018 footage from a hallway security camera shows Klosterman in a middle-school hallway, as phrased by Peeters,

> [R]each[ing] down with both hands toward a male student sitting on the ground in the hallway. Klosterman then assisted this student to his feet and then quickly transitioned into Klosterman having his arms around the student's upper body as well as the neck and head region. They were very close together, as Klosterman and this young boy's body were touching. Their faces were very close and the video appeared as though Klosterman was kissing this male student, however, the video was not definitive in that regard.

Peeters followed up with the student, and the boy "indicated that nothing inappropriate had happened between him and Mr. Klosterman," so Peeters "determined that no criminal violation had occurred."

¶6 At a home football game on September 7, 2018, Peeters observed Klosterman "as a lone adult intermingling among [a] middle school crowd" and "either hugging or placing hands on shoulders or arms" of multiple middle-school boys; however, Peeters "did not see any touching of private areas." Later that evening, Peeters observed Klosterman "standing somewhat isolated from other people at the football game with one male student." They were "standing very close to each other face to face. Both Klosterman and this male student were holding hands with both hands" for approximately one and one-half minutes. Peeters opined that the nature of the hand holding appeared to be "more intimate." During the game, a school staff member approached Peeters and asked him if he was observing Klosterman's conduct. Peeters later informed the school district administration of his observations, but acknowledged in his report that he had not observed any criminal violations.

¶7 Subsequently, Peeters also viewed video footage that had been taken at the game, which showed Klosterman walking up to and "hug[ging] from behind"

3

two male students. Shortly thereafter, Klosterman "puts his arm around a student." A few minutes later, Klosterman approaches another student and "bends his knees to lower himself to the approximate height of this student and has full contact with the front of his body against this student and hugs this student" for about five seconds in what Peeters describes as a "full body hug." Minutes later, Klosterman "giv[es] another student a hug," in which he "physically picks the student up off of the ground while hugging."

¶8 On September 17, 2018, Peeters was informed that the school district board had been made aware of concerns related to Klosterman's physical contact with students, and the board requested that Peeters speak with Klosterman about these concerns. Peeters spoke with Klosterman, but Klosterman told Peeters "that he was not going to change his behavior," explaining that if he did so, students would notice the change "and then start questioning if something was wrong with their previous interactions with Klosterman." Peeters relayed this conversation to the school administration.

¶9 On October 10, 2018, a staff member reported to the District "uncomfortable" conduct by Klosterman that the staff member had observed. The staff member's written statement[1] indicates that two or three weeks earlier the staff member had observed Klosterman in a classroom sitting back-to-back with a male student in the same bean bag chair, and it appeared that Klosterman "was moving side to side, rubbing his back against the back" of this student. Then, on October 8, 2018, this same staff member observed Klosterman sitting next to a male student who was wearing shorts; the staff member believed this was the same student as in

---

[1] The staff member wished to remain anonymous, so that person's identity is not identified in the written statement or elsewhere in the record.

the bean-bag-chair incident. Klosterman "was leaning against the student" with his arm "lying lengthwise down the student's [t]high" and his hand "cupping the student's knee." When Klosterman noticed the staff member, he "changed his behavior by quickly taking his hand and arm off of the student and separating himself from the student." The staff member believed Klosterman's contact with the student to be "inappropriate … for a student/teacher relationship."

¶10 The District, "concerned about the welfare of their students," sought to investigate further. On October 12, 2018, Peeters, the superintendent, and the human resource officer, attempted to speak with several of the students and parents regarding interactions with Klosterman. In one meeting with the parents of one of the students, the mother reported that her son confides in Klosterman. She also reported that Klosterman had previously informed the parents that if they were to observe him hugging their son, it is because the son often approaches Klosterman "for the hugs and … affection." The son was then brought in to the meeting, during which time Peeters learned that the son had been in counseling over the past year. The son reported that he "d[id] not feel uncomfortable by any of the interactions that he has with Neil Klosterman."

¶11 Peeters, the superintendent, and the human resource officer also made phone contact with the father of a student who used to attend the middle school where Klosterman taught.[2] The father reported having observed Klosterman at varsity basketball games "sitting on the bleachers[,] leaning back, [and] putting his arm around young boys." The father expressed his concern about the amount of time Klosterman spends with young minors.

---

[2] This father is identified by name in Peeters' report, but because his name is not pertinent to our decision, we do not include it here.

¶12     Later that same day, Peeters and the superintendent met with the student involved in the bean-bag-chair incident, along with the boy's mother.  The boy "denied any physical contact ever between he and Klosterman other than high 5's."  When asked about the reported incident in which Klosterman allegedly was cupping the boy's knee just days earlier, the boy "appeared to have a difficult time remembering the details and his story did change a few times."  The boy "did acknowledge sitting next to Klosterman during this study hour" and did admit that he was wearing shorts that day, but "[h]e stated that ... Klosterman's hands were on the desks and were never at any point on his leg."  The boy "indicated that he has never felt uncomfortable with any of the interactions between him and Neil Klosterman."  Peeters and the superintendent also learned that the boy had been paid to mow Klosterman's lawn, did other work at Klosterman's home, and would be left at Klosterman's residence "with Klosterman without any other adult supervision and would play Fortnite in Klosterman's theater room."

¶13     On October 15, 2018, Peeters and the superintendent met with Patti Crump, a former law enforcement officer with "over 20 years of investigating sensitive crimes and sexual offenders."  Crump expressed that many of Klosterman's actions "mirror" sex offenders she has investigated.  She further expressed her opinion that Klosterman "should not be around kids."

¶14     A staff member, who wished to remain anonymous,[3] informed Peeters that he/she had been in the school on a weekend in the past when the staff member observed Klosterman walking down the hall with his arm around a young male

---

[3] Even though the staff member wished to remain "anonymous," Officer Peeters appears to have been aware of the staff member's identity as Peeters reinterviewed the staff member multiple times.

6

student. The staff member confronted Klosterman away from the student, "asking him what he is doing and explaining that that was inappropriate behavior."

¶15 At the end of his report, Peeters indicated that he was closing the case because no criminal violations had been alleged.

¶16 Also included with the superintendent's affidavit and exhibits was a letter received by the superintendent from a "Concerned Middle School Parent and Co-Worker" as well as the reports of two other individuals, named "Mark" and "Danielle." The letter addresses observations the parent/co-worker had made of Klosterman's conduct at the September 7, 2018 football game, including that Klosterman had "more than one time put his arm around male students" and had given male students "long hugs with arms wrapped all the way around." The parent/co-worker added that he/she "thought I even saw [Klosterman] run his hand down the side of a student's face, as to say it was alright" and that he/she further observed Klosterman "go up to a group of kids, talk to them all for a bit, then it appeared he would separate himself from the group and pull [one] male student at a time … out of the larger group to give them a hug or talk with them." This parent/co-worker reported these observations to the high school principal as well as to Peeters and asked both of them to help keep an eye on Klosterman's behavior at the game.[4] The reports of Mark and Danielle indicate that on September 5, 2018, they observed Klosterman in the middle-school hallway with his arm around a male student's shoulder. Klosterman then slid his hand down to the middle of the student's back, before moving away from the student.

---

[4] Though not clear from the record, it is possible this parent/co-worker is the same District staff member who approached Peeters during the September 7, 2018 football game and asked him if he was observing Klosterman's conduct. *See supra* ¶6.

¶17     By letter of October 15, 2018, the District informed Klosterman that he was being placed on administrative leave "pending the District's investigation into allegations of inappropriate conduct with minors." Klosterman was instructed that during the leave, he was "not to enter any District grounds or buildings, unless you are given prior express permission by" the human resources director or the superintendent.[5] Klosterman resigned his employment with the District on December 10, 2018.

¶18     More than once following his resignation, Klosterman requested that the District lift the prohibition against him coming onto District property. The superintendent's affidavit explains that the superintendent attended a school board meeting on June 17, 2019, in which the board considered Klosterman's request. The board was provided with "documents and information collected during Mr. Klosterman's personnel investigation, and was shown the [Spring 2018] video footage" from the hallway security camera, which showed Klosterman with his arms around a male student's head and neck region with their bodies touching. Additionally, the board "heard from a former law enforcement specialist in investigating sensitive crimes and sexual offenders, who opined that Mr. Klosterman's behavior was consistent with 'grooming' behaviors exhibited by sexual predators." "After reviewing the documents and information available to it,

---

[5] In addition to the prohibition against entering onto District property without permission, the October 15, 2018 letter also placed other restrictions on Klosterman, who was still an employee of the District at the time, including that Klosterman was to have "no contact with students, parents, or District staff," except for the human resources director and the superintendent. On appeal, no party seeks review of, develops arguments related to, or suggests that these other restrictions are still in effect now that Klosterman is no longer a District employee. Indeed, in a July 1, 2019 letter to Klosterman, the school board president wrote that the board had considered Klosterman's request that the board "reconsider its position" but that the board unanimously agreed to "continu[e] the directive that you remain off premises." For these reasons, we only discuss the prohibition against Klosterman entering onto District property without prior approval from either the superintendent or human resources director.

which included credible testimony and concerns from multiple independent sources, including several staff members and law enforcement professionals, the [b]oard determined that Mr. Klosterman's presence on school grounds would be detrimental to the good order of the school." The superintendent further avers that "[d]ue consideration was paid to the fact that criminal charges had not been filed against Mr. Klosterman. However, the [b]oard concluded that allowing Mr. Klosterman on school grounds would unnecessarily expose students to potentially dangerous behavior." A July 1, 2019 letter from the school board president informed Klosterman that the board had unanimously agreed to "continu[e] the directive that you remain off premises."

¶19 The board met again on September 25, 2019, for the purpose of considering a letter from Klosterman's legal counsel requesting that the board lift the ban against Klosterman entering upon District property. The board again reviewed the "background documentation and information garnered during the investigation, and considered whether any intervening circumstances warranted reversal of the [b]oard's earlier decision." The superintendent expressed to the board his belief that Klosterman should not be permitted near students on District property, and the board again voted unanimously to reject Klosterman's request to lift the ban.

¶20 Klosterman filed this suit seeking a declaratory judgment that his ban from District property is unlawful and prohibiting the District from "block[ing] or enjoin[ing]" him from District property. The District moved for summary judgment, which the circuit court granted. The court concluded that the school board had the legal authority to act as it did, had a "rational basis" for banning Klosterman, did not erroneously exercise its discretion, and did not act arbitrarily or capriciously. Klosterman appeals.

*Discussion*

¶21    Klosterman contends the circuit court erred in granting summary judgment to the District because the school board cannot lawfully impose and maintain a prohibition against someone entering upon District property.  He further asserts that even if the board does have such authority, it lacked reasonable grounds to impose such a ban against him.  We disagree with Klosterman on both points.

¶22    Our review of a circuit court's decision on summary judgment is de novo.  ***Behrendt v. Gulf Underwriters Ins. Co.***, 2009 WI 71, ¶11, 318 Wis. 2d 622, 768 N.W.2d 568.  Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  ***Id.***

School Board Authority to Ban an Individual from District Property

¶23    WISCONSIN STAT. § 120.13 (2019-20) identifies various "School board powers."[6]   In this case, both parties erroneously focus their attention on § 120.13(35), which states:

> PRESENCE IN SCHOOL BUILDINGS. (a) A school board may adopt rules applicable to persons *who enter or remain in a building* operated by the school board, including requirements that such persons identify themselves and sign in when entering or remaining in the building or any specified portion of the building and designating time periods during which such persons may enter or remain in the building or any portion of the building.

(Emphasis added.)   This provision does not govern this case as it deals with the establishment of rules and conditions related to persons who *do enter* District "buildings"

---

[6] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

specifically whereas the board has more broadly prohibited Klosterman from even entering in the first instance upon *any* District property. Other statutory provisions govern this case.

¶24    WISCONSIN STAT. § 120.12 provides: "**School board duties**. The school board … shall: (1) … have the possession, care, control and management of the property and affairs of the school district." The introductory language of WIS. STAT. § 120.13, again, relating to "School board powers," provides that a school board "may do all things reasonable to promote the cause of education."

And WIS. STAT. § 118.001 provides:

> **Duties and powers of school boards; construction of statutes**. The statutory *duties* and *powers* of school boards shall be *broadly construed* to authorize *any* school board action that is within the *comprehensive meaning* of the terms of the duties and powers, if the action is not prohibited by the laws of the federal government or of this state.

(Emphasis added.)

¶25    As Klosterman questions in the first instance the legal authority of the board to ban an individual from coming onto District property, we must interpret these provisions to determine if they afford a board such authority. Interpretation of statutory provisions is a legal matter we consider independently. *State v. Muniz*, 181 Wis. 2d 928, 931, 512 N.W.2d 252 (Ct. App. 1994). Together, these three statutory provisions provide that a school board has the power to do "all things reasonable to promote the cause of education" and the duty to care for, control and manage the property and affairs of the District, and we are required to broadly construe such already broad powers and duties so as to authorize "any" school board action that is within the "comprehensive meaning" of the terms of such powers and duties, so long as the action—here, the banning of an individual from District

11

property—is not prohibited by state or federal laws.[7]  *See* WIS. STAT. §§ 120.13, 120.12, 118.001.

¶26     In *Hortonville Joint School District No. 1 v. Hortonville Education Ass'n*, 426 U.S. 482 (1976), the United States Supreme Court, reviewing a decision of our state supreme court, observed that under Wisconsin law, and WIS. STAT. § 120.12(1) specifically, school boards have "broad power over 'the possession, care, control and management of the property and affairs of the school district.'" *Id.* at 487.  The Court recognized that in Wisconsin, the board "is the body with overall responsibility for the governance of the school district; it must cope with the myriad day-to-day problems of a modern public school system," and it indicated that the board should be permitted "to make … decision[s] [that] preserve[] its control over school district affairs." *Id.* at 495-96.  The Court questioned whether a judge

> can generally make … as good a judgment as the School Board, which is intimately familiar with all the needs of the school district…. More important … it will be the School Board that will have to cope with the consequences of the decision and be responsible to the electorate for it.

*Id.* at 496 n.5.  A year later, our state supreme court echoed that "[a]s much control as possible should be left with the school board to set policy and manage the school." *Naus v. Joint Sch. Dist. No. 1 of Sheboygan Falls*, 76 Wis. 2d 104, 112, 250 N.W.2d 725 (1977) (citation omitted).

---

[7]  Although Klosterman asserts the ban violates his "constitutional rights," he fails to even state which "rights" he is referring to and fails to explain how the lone case he cites—a non-binding, federal decision out of the Court of Appeals for the Second Circuit, *Johnson v. Perry*, 859 F.3d 156 (2d Cir. 2017)—applies to this case.  Furthermore, WIS. STAT. § 120.13(35) does not operate as a state law that "prohibits" a ban such as the one in this case, and Klosterman has developed no argument to suggest that it does.  Klosterman has identified no other state or federal laws that might possibly prohibit the ban here.

¶27    In 1995, the legislature created WIS. STAT. § 118.001 and amended WIS. STAT. § 120.13 to add the introductory language providing that a school board "may do all things reasonable to promote the cause of education."  1995 Wis. Act 27, §§ 3931, 4024.  In *Madison Metropolitan School District v. Burmaster*, 2006 WI App 17, 288 Wis. 2d 771, 709 N.W.2d 73, we noted that prior to these changes, case law "construed the statutory authority of school boards under the enumerated powers doctrine, whereby the powers were limited to those expressly conferred by statute or necessarily implied."  *Id.*, ¶16.  Considering the 1995 changes, we expressed that "the introductory language [of § 120.13], when read in the context of the rest of § 120.13," means that "school boards have powers beyond those enumerated in subsecs. (1)-(37) [now (1)-(38)]."  *Madison Metro. Sch. Dist.*, 288 Wis. 2d 771, ¶20.  We further stated that the changes "express[ed] the legislature's intent to give school boards broader powers and wide discretion in exercising those powers."  *Id.*, ¶18 (citing *Pritchard v. Madison Metro. Sch. Dist.*, 2001 WI App 62, ¶14, 242 Wis. 2d 301, 625 N.W.2d 613).  We added that WIS. STAT. §§ 120.12(1) and 120.13 give school boards a "broad grant of powers" that § 118.001 mandates must be "liberally construed."  *See Madison Metro. Sch. Dist.*, 288 Wis. 2d 771, ¶23; *see also Pritchard*, 242 Wis. 2d 301, ¶14.

¶28    In *Pritchard*, we considered whether a school board could lawfully authorize the payment of health insurance benefits for "unmarried partners of school district employees" when WIS. STAT. § 66.185 specifically authorized the payment of such benefits only for "employees and officers … and their spouses and dependent children."  *Pritchard*, 242 Wis. 2d 301, ¶¶5, 14.  We noted that

> WISCONSIN STAT. § 120.44(1) provides that a unified school district has "the power to sue and be sued, to levy and collect taxes, to acquire, hold and dispose of property and to do all other things reasonable for the performance of its functions in operating a system of public education."  Under WIS.

> STAT. §§ 120.44(2) and *120.12(1)*, the management and control of the District is vested in the school board. WISCONSIN STAT. § *120.13* provides the school board "may do all things reasonable to promote the cause of education, including establishing, providing and improving school district programs, functions and activities for the benefit of pupils"; and this includes "spend[ing] money as needed to meet the immediate expenses of operating and maintaining the public instruction in the school district," § 120.13(33).

*Id.*, ¶11 (alteration in original; emphasis added; footnote omitted). We determined that in light of the broad construction of school board powers mandated by WIS. STAT. § 118.001 and the powers granted under WIS. STAT. ch. 120, the powers of a school board "include the power to provide health insurance benefits to [unmarried] partners." *Pritchard*, 242 Wis. 2d 301, ¶16; *see also* ***Larson v. Burmaster***, 2006 WI App 142, ¶23, 295 Wis. 2d 333, 720 N.W.2d 134 (considering WIS. STAT. §§ 118.001, 120.12 and 120.13 and concluding that a teacher's requirement that students do summer homework "fits comfortably within the range of what is reasonable").

¶29    As indicated, the legislature has provided that school boards have the power to "do all things reasonable to promote the cause of education," WIS. STAT. § 120.13, and have the duty to possess, care for, control and manage "the property and affairs" of their respective districts, WIS. STAT. § 120.12(1). Moreover, we are expressly directed to construe such powers and duties broadly so as to "authorize *any* school board action that is within the comprehensive meaning of the terms of the duties and powers," WIS. STAT. § 118.001 (emphasis added), so long as the action is not prohibited by state or federal laws. If a school board's discretion is wide enough to allow it to authorize an entire category of persons to be eligible for health insurance benefits beyond the categories specifically enumerated in the statutes, as in *Pritchard*, certainly it is wide enough to authorize a ban from District property of an individual whose presence on District property the board has

determined "would unnecessarily expose students to potentially dangerous behavior." In light of the legislature's broad and strong language deferring to the judgment of school boards, we have no difficulty holding that a board has just such authority. *See Anderson v. Hansen*, 489 F. Supp. 3d 836, 845 (E.D. Wis. 2020) ("[N]o person has an absolute right to enter school property.").

The Ban of Klosterman

¶30 We next consider whether the school board here erroneously exercised its "wide discretion" related to its "broad[] powers" in specifically banning Klosterman from District property. *See Madison Metro. Sch. Dist.*, 288 Wis. 2d 771, ¶18; *see generally Klinger v. Oneida County*, 149 Wis. 2d 838, 844, 440 N.W.2d 348 (1989) ("The legislature vested discretion in the [county] Board [of Adjustment] and did not intend a circuit court to substitute its discretion for that committed to the Board."); *Tagatz v. Township of Crystal Lake*, 2001 WI App 80, ¶¶9-10, 243 Wis. 2d 108, 626 N.W.2d 23 (reviewing for an erroneous exercise of discretion where statute affords town board the discretion as to whether to lay out a road). We conclude it did not.

¶31 As the District here notes, the record upon which the school board made its decision to ban Klosterman was undisputed. We conclude that the board acted reasonably in enacting this ban, first and foremost because the ban is designed to keep students safe on District property, and, as the board understandably determined, "allowing Mr. Klosterman on school grounds would unnecessarily expose students to potentially dangerous behavior." Additionally, based on the board's foreknowledge of Klosterman's physical contact with middle-school boys and refusal to cease such contact, the ban also protects the District against future criticism and legal action if Klosterman were to harm a child on District property.

¶32    Klosterman relies heavily upon the fact that he has not been criminally charged and his teaching license has not been revoked.  But the school board needed neither a criminal conviction nor license revocation before it could act to protect children under its care, and Klosterman has identified no law suggesting it did.  By the time a person has been convicted of a crime, harm has long since already occurred.  The board need not wait for such harm to its students (and the civil lawsuits against the District which would likely follow).[8]  Instead, as indicated, the

---

[8] To put this in another context, what if Klosterman had instead been observed (perhaps videotaped) "making out"—but with no sexual contact as defined by state statutes—with a thirteen-year-old girl at a local park.  It is not at all clear that this conduct would constitute a crime under state statutes, yet the school board would certainly act reasonably to promote the cause of education if it banned Klosterman as it did in this case.  While the facts before the school board in this particular case are different than making out with a thirteen-year-old girl, the question is the same—whether this board, based upon these facts, acted reasonably to promote the cause of education in instituting and maintaining this ban.  Or, put another way, since the votes in favor of this ban have always been unanimous, whether every one of these locally elected school board members acted unreasonably in voting for it.

It is worthwhile to note that since the ban was first implemented in October 2018, there have been at least four new school board members who have replaced prior members.  *See* School Dist. of Omro, *School Bd.*, https://www.omro.k12.wi.us/district/school-board.cfm (last visited Sept. 14, 2022) (identifying four board members who have served since 2019 or later).  The school board elections that have taken place since Fall of 2018 obviously have afforded the electorate a ready-made opportunity to replace "unreasonable" school board members with members it deems more "reasonable" and willing to modify or repeal this ban.  Despite this opportunity, the board has not modified or repealed it, although Klosterman has repeatedly asked the board to repeal it.  Significantly, the board *still* has the power to modify or repeal it at any time.  Klosterman himself ran for the Omro School Board in the April 2020 election but came in last out of four candidates, garnering 19.8% of the ballots cast and failing to secure a seat on the board.  The top two vote-getters were incumbents who have repeatedly voted to maintain the ban.  School Dist. of Omro, *School    Bd.*,    Bd.    of    Canvassers    Meeting    Minutes,    Apr.    15,    2020, https://docs.google.com/document/d/1YNXtywGCbdKZjUIiUjQl5zggBdCg8gxYyMxDFmyb_S0/edit.

To reiterate what the United States Supreme Court has emphasized—specific to Wisconsin no less—the school board "is the body with overall responsibility for the governance of the school district; it must cope with the myriad day-to-day problems of a modern public school system" and should be permitted "to make … decision[s] [that] preserve[] its control over school district affairs." ***Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Ass'n***, 426 U.S. 482, 495-96 (1976).  The case before us is a tailor-made example of the Court's doubts as to whether "a judge can generally

---

board has its own independent powers to "do all things reasonable to promote the cause of education," WIS. STAT. § 120.13, as well as the duty to "care [for], control and manage[] the property and affairs" of the District, WIS. STAT. § 120.12(1).

¶33    In this case, the record before the school board was replete with evidence supporting the ban.[9]  According to Peeters' report, the hallway security camera footage showed Klosterman with a male middle-school student in a school hallway with Klosterman

> reach[ing] down with both hands toward a male student sitting on the ground in the hallway.  Klosterman then assisted this student to his feet and then quickly transitioned into Klosterman having his arms around the student's upper body as well as the neck and head region.  They were very close together, as Klosterman and this young boy's body were touching.  Their faces were very close and the video appeared as though Klosterman was kissing this male student, however, the video was not definitive in that regard.

In an affidavit submitted for summary judgment purposes, Klosterman averred that the student had been "poked in the eye," so Klosterman "looked right in [the boy's] face to take a look at his eye."  To begin, Klosterman directs us to nothing in the record, and we are able to find nothing, suggesting he has at any time presented this explanation to the board.  That said, we doubt such an explanation would have gone far with the board as our own review of the still photos from that video—which video footage the board specifically reviewed before denying Klosterman's post-resignation request to have the ban lifted—shows that whether or not Klosterman

---

make … as good a judgment as the School Board, which is intimately familiar with all the needs of the school district."  *Id.* at 496 n.5.  And, of note, the Court's strong observations regarding Wisconsin law as to school board authority were made *before* the legislature even more greatly broadened the powers, duties and discretion afforded to school boards in 1995. *See supra* ¶27.

[9] Klosterman has developed no argument challenging the reliability of any of the reports considered by the school board, even those from anonymous sources.  As a result, we need not delve into an analysis of such an issue.

had looked at the boy's eye at some point, he also engaged in physical contact with this student that is completely consistent with Peeters' reported description.

¶34    Peeters also reported personally observing Klosterman at a football game standing with one male student "somewhat isolated" from others and "very close to each other face to face," and Klosterman and this student were "holding hands with both hands" for approximately one and one-half minutes. Peeters' impression of the hand holding was that it appeared "more intimate." A school staff member at the game approached Peeters, also concerned about Klosterman's conduct that night, specifically asking Peeters if he was observing Klosterman's conduct. Peeters reported that video footage from the game revealed Klosterman approaching and "hug[ging] from behind" two male students and later hugging a student in such a manner that Klosterman had "full contact with the front of his body against this student," in a "full body hug" for about five seconds. Minutes later, Klosterman hugged another student in which he "physically pick[ed] the student up off of the ground while hugging."

¶35    The school board asked Peeters to speak with Klosterman about its concerns with such behavior. When Peeters did so, Klosterman told him "that he was not going to change his behavior."

¶36    Around this same time period, a staff member reported observing Klosterman in a classroom sitting back-to-back with a male student in the same beanbag chair, and Klosterman appeared to be "moving side to side, rubbing his back against the back" of this boy. On a later date, the staff member observed Klosterman sitting next to a male student who was wearing shorts, and who the staff member believed was the same male student as in the beanbag-chair incident. Klosterman "was leaning against the student" with his arm "lying lengthwise down

the student's [t]high" and his hand "cupping the student's knee." When Klosterman saw the staff member, he "changed his behavior by quickly taking his hand and arm off of the student and separating himself from the student." It was the staff member's opinion that Klosterman's contact with the student was "inappropriate … for a student/teacher relationship." When Peeters and the superintendent subsequently spoke with this student directly, he "denied any physical contact between he and Klosterman other than high 5's," but when asked specifically about the reported incident of Klosterman having his hand on the boy's knee just days earlier, the boy "appeared to have a difficult time remembering the details and his story did change a few times." The boy "did acknowledge sitting next to Klosterman during this study hour" and did admit that he was wearing shorts that day, but denied that Klosterman's hand was on his leg. Peeters and the superintendent also learned that the boy had been paid to mow Klosterman's lawn, did other work at Klosterman's home, and would be left at Klosterman's residence "with Klosterman without any other adult supervision and would play Fortnite in Klosterman's theater room."

¶37    When Peeters and the superintendent met with a former law enforcement officer with "over 20 years of investigating sensitive crimes and sexual offenders," the officer expressed that Klosterman's actions and statements "mirror" sex offenders she has investigated, and she expressed her opinion that Klosterman "should not be around kids."

¶38    Klosterman's excessive physical contact with young male students, including engaging in full body hugs/contact, and his refusal to abstain from such contact in the future posed a significant risk—a physical and psychological risk to children on District property and a legal/financial risk to the District and ultimately

District taxpayers.[10] Even if the anonymous reports are not considered, there was ample evidence of the risk posed by Klosterman. The full body touching displayed in the hallway video, the face-to-face closeness and intimate handholding in an isolated area at the football game, and the "full contact with the front of his body against [a] student" in a "full body hug" at the football game provided enough evidence to make the board's decision to ban Klosterman reasonable to promote the cause of education by keeping students safe. Adding to that the experience-based opinion of the seasoned law enforcement officer, the board acted extremely reasonably in instituting and maintaining the ban against Klosterman coming onto District property; it certainly did not erroneously exercise its "wide discretion." *Madison Metro. Sch. Dist.*, 288 Wis. 2d 771, ¶18.

¶39 Additionally, it is worth noting that the board did not institute and does not maintain an absolute ban on Klosterman entering upon District property. Instead, Klosterman was directed "not to enter any District grounds or buildings, *unless* you are given prior express permission" by the human resources director or the superintendent. (Emphasis added.) The record suggests that Klosterman has made no attempt to seek permission from the superintendent or human resources director to attend specific functions or events.[11] Thus, as far as we know at this point, had such a request been made, it may have been granted either outright or with conditions that would allow Klosterman to participate in or observe a particular

---

[10] Though the District has remained focused on the security and well-being of its students, no doubt there would also be concern about liability to which it would be exposing District taxpayers if it failed to act on the information it had regarding Klosterman's penchant for excessive physical contact with young male students, especially after learning that Klosterman's conduct "mirror[ed]" that of sex offenders a seasoned law enforcement officer had investigated.

[11] In his appellate briefing, Klosterman says he "is asking to be allowed access to sporting events that are open to the general public." To this concern, we note that the board's restriction only applies to Omro School District property; there has been no suggestion that it would prohibit attendance at sporting events held off District property.

event and yet help ensure the safety of children. *See, e.g.*, ***Jackson v. McCurry***, 762 Fed. App'x. 919, 923, 928-29 (11th Cir. 2019) (concluding the superintendent did not violate clearly established law by barring a father who was found to "pose[] a threat to the safety of the school's employees and students" from making any "unauthorized" appearances at school or extracurricular activities where students would be present, except to drop off or pick up his daughter, and if he did attend a school event, he was required to "remain in the designated area for parents").

   *By the Court.*—Order affirmed.

**No. 2020AP2076(D)**

¶40 GROGAN, J. (*dissenting*). I agree that WIS. STAT. § 120.12(1) provides school boards with the authority to manage "the property and affairs of the school district" and that WIS. STAT. § 118.001 requires "[t]he statutory duties and powers of school boards" to "be broadly construed[.]" But, both of these statutes include limitations,[1] and neither confers *unfettered* discretion upon a school board.[2] And, a school board's statutory authority does not trump an individual's personal liberties guaranteed by the federal and state constitutions. *See* § 118.001. The majority affirms a ban that has continued for approaching four years—apparently without a single violation—in the small community of Omro (population of approximately 3,500), where the "school grounds" include walking trails and other

---

[1] WISCONSIN STAT. § 120.12 provides that "[t]he school board of a common or union high school district shall:"

> Subject to the authority vested in the annual meeting and to the authority and possession specifically given to other school district officers, have the possession, care, control and management of the property and affairs of the school district, except for property of the school district used for public library purposes under s. 43.52.

Sec. 120.12(1).

WISCONSIN STAT. § 118.001 provides:

> The statutory duties and powers of school boards shall be broadly construed to authorize any school board action that is within the comprehensive meaning of the terms of the duties and powers, if the action is not prohibited by the laws of the federal government or of this state.

[2] "School board," "Board," and "Omro School Board" are used interchangeably.

areas that are open to the public. It bases its decision on the introductory language of WIS. STAT. § 120.13, which says a "school district may do all things reasonable to promote the cause of education," and § 118.001's text requiring broad construction of a school board's duties and powers. But, "all things reasonable" cannot mean "anything and everything[,]" *see James v. Heinrich*, 2021 WI 58, ¶22, 397 Wis. 2d 517, 960 N.W.2d 350 ("What is reasonable and necessary cannot be reasonably read to encompass anything and everything."), and the text of § 120.13 itself says "all things reasonable" must directly relate "to promot[ing] the cause of education[.]"[3]

¶41     Without fully analyzing WIS. STAT. § 120.13—a very lengthy statute that primarily ties the "promot[ion] [of] the cause of education" language to actions by "pupils"—the majority blithely expands the Board's statutory authority far beyond the statute's text and opens wide a door through which any school board

---

[3] The majority, like the circuit court, appears to base its analysis almost exclusively on what was purportedly before the Board at the time the Board made its decision to ban—and subsequently to continue to ban—Klosterman, despite recognizing that procedurally, this matter is before the court on an appeal of a grant of summary judgment. I therefore consider the *entirety* of the Record as it pertains to the summary judgment filings. *See* WIS. STAT. § 802.08(2) ("The [summary] judgment sought shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."). Therefore, assuming the majority has correctly construed WIS. STAT. § 120.13 and its applicability here, the question is not whether the Board's decision to ban Klosterman is "reasonable to promote the cause of education" based exclusively on the information before the Board (and it is not even clear what, exactly, comprises the entirety of the information before the Board or whether that information remained static throughout or was instead supplemented each time Klosterman requested the ban be removed), but rather whether there are any genuine issues of material fact as to whether the Board's decision was "reasonable to promote the cause of education" based on *all* of the summary judgment filings. Importantly, failing to consider the full scope of the summary judgment filings and instead limiting review to the information before the Board at the time it made its decisions would effectively give the Board an unfettered ability to define the scope of materials it considers and, in turn, allow the Board to both define and limit the scope of documents and information subject to judicial review on summary judgment.

2

could take any action to exert authority indefinitely over any person in regard to his presence on any school property (not just school buildings) under the guise of it being related to the promotion of education.[4]  I respectfully dissent.

¶42     Before I begin, it is important to identify the legal issues that are—and are not—involved here.  This appeal is *not* about the administrative restrictions in place during the time Neil Klosterman, while still a School District of Omro (the District) employee, was on paid administrative leave in October 2018 while the District investigated an anonymous staff member's report about feeling uncomfortable after allegedly observing Klosterman physically touch a student.[5]  Rather, this appeal requires consideration of the circumstances, if any, under which a school board has the authority to impose restrictions over a member of the public, and if so, whether, in the context of a summary judgment motion, this school board has demonstrated that there are no genuine issues of material fact regarding whether the restrictions imposed upon Klosterman are "reasonable to promote the cause of education[.]"

---

[4] One need look no further than the majority opinion's footnote eight to see just how far the majority opinion's "interpretation" of the statute extends a school board's power.  Majority, ¶32 n.8.

The majority opinion props up its statutory "interpretation" by pointing out the school board's refusal to lift the restrictions was unanimous.  But, unanimity is not a relevant factor in interpreting a board's scope of statutory authority.  Likewise, the majority opinion's reliance on the statements it pulls from *Hortonville Joint School District No. 1 v. Hortonville Education Ass'n*, 426 U.S. 482, 495-96 (1976), are unpersuasive.  *Hortonville* involved a school board's authority to fire teachers who broke the law.  *Id.* at 496.  This case is not about whether a school board has the statutory authority to dismiss its teachers.

[5] Although both Klosterman and the student involved denied inappropriate touching, the report triggered an investigation to determine the truth and validity of the expressed concern.

¶43    Specifically, Klosterman challenges the Board's refusal to lift the restrictions—which are based solely on a combination of almost four-year-old conduct that made anonymous staff members feel uncomfortable and "facts" built on multiple layers of hearsay—*after* the District concluded its October 2018 investigation.  Those restrictions include the following:

> 1. You are ordered not to enter any District grounds or buildings, unless you are given prior express permission by myself [the Human Resources Director] or Superintendent Rieckmann;
>
> 2. You are directed to have no contact with students, parents, or District staff, with the exception of myself and Superintendent Rieckmann[.][6]

The majority, noting that Klosterman addresses only the property restriction on appeal, declines to address the second restriction and instead presumes the no-contact restriction ended when Klosterman resigned.  Majority, ¶17 n.5.  It is unclear, however, whether the no-contact restriction remains in place, as the Board's brief points out that Klosterman's Complaint "sought the blanket removal of *all* restriction*s* placed upon him" (emphasis added), and Klosterman's own affidavit alleges the *restrictions*—plural—in place during his administrative leave "exist today, including the inability of me to be on the school grounds, even those parts which are public property and areas that are open to the public."  Because the majority declines to address the second restriction, the question of whether the Board has authority to impose an unqualified ban on having *any* contact with *any* student, parent, or staff member remains unresolved, as does the question of whether the unqualified ban violates Klosterman's constitutional rights.

---

[6] The remaining two restrictions in the District's October 2018 directive were directly related to the investigation that occurred while Klosterman was still employed and are therefore not relevant here.

¶44 In addressing the first restriction, the majority concludes the Omro School Board has the statutory authority to prohibit anyone from ever coming onto school grounds without prior permission—regardless of whether students are present. It likewise concludes the Board acted reasonably to promote the cause of education despite: (1) the fact that it did not identify any student who alleged inappropriate physical contact during the thirteen years Klosterman taught, coached, and mentored students in the District; (2) the investigations having been closed without finding evidence of any inappropriate conduct, let alone conduct rising to the level of a criminal violation; (3) DPI[7] not having found any basis to revoke his teaching license; and (4) Klosterman never having been charged with, tried for, or convicted of a crime related to the incidents described—or any other crime at all. According to the majority, it is reasonable (to promote the cause of education) for the Board to ban a member of the public from school grounds (not just school buildings and not just during school hours), regardless of whether students are present, despite such a ban being based on nothing more than anonymous reports from distant observers (made years ago) who were unfamiliar with the students or the context in which the conduct occurred and despite a lack of concern about any physical contact from the students (and their parents) involved.

---

[7] DPI is the acronym for the Department of Public Instruction, which oversees licensing for teachers in the State of Wisconsin. While the school was investigating Klosterman, Superintendent Kelly Rieckmann referred the matter to DPI, which conducted its own investigation.

Klosterman's brief reports that DPI concluded there was no basis to revoke his teaching license, and the District does not contest this. The DPI website, which I take judicial notice of, confirms that Klosterman's teaching license has not been suspended or revoked. Wis. Dep't of Pub. Instruction, *Educator Licensing Online*, https://elo.wieducatorlicensing.org/datamart/licenseDetails.do?xentId=248085 (last visited August 10, 2022). *See* WIS. STAT. § 902.01(2)(b).

5

¶45 Again, this appeal comes to us after the circuit court granted the District's summary judgment motion. "In reviewing a decision on summary judgment, we utilize the same methodology as that applied by the circuit court. A reviewing court thus will not reverse a summary judgment decision unless the record reveals that one or more genuine issues of material fact are in dispute or the moving party is not entitled to judgment as a matter of law." *Strasser v. Transtech Mobile Fleet Serv., Inc.*, 2000 WI 87, ¶30, 236 Wis. 2d 435, 613 N.W.2d 142 (citations omitted); *see also* WIS. STAT. § 802.08(2). The dispositive question then is: was summary judgment properly granted? In answering that question, we need to decide both whether the statutes authorize the District's action, and if so, whether the summary judgment submissions create any genuine issues of material fact with respect to whether the Board's refusal to lift the broad and indefinite restrictions it imposed on Klosterman almost four years ago are "reasonable to promote the cause of education[.]"

¶46 The majority concludes as a matter of law that "the board acted extremely reasonably in instituting and maintaining the ban against Klosterman coming onto District property[.]"[8] Majority, ¶38. However, in doing so, the majority selects facts from the Record that support the outcome it reaches without providing the full context necessary to fairly and objectively resolve this summary judgment appeal. In doing so, it relies heavily on the affidavit of now-Superintendent Jay Jones, still images from a Spring 2018 video (the video itself is

---

[8] In reaching this conclusion, the majority fails to connect "reasonableness" to promoting the cause of education, which is, under the majority's statutory interpretation, what WIS. STAT. § 120.13 requires.

not part of the record), and what purports to be Officer John Peeters' "report."[9] Significantly, Jones became the Omro Superintendent in August 2019[10] and avers he has neither met Klosterman, nor was he personally involved in the 2018 investigation or imposition of restrictions. Jones explains that, before he became Superintendent, his only knowledge of Klosterman's situation "was through public outlets," he never met Klosterman, he "never had any direct or indirect relationship with" Klosterman, and attaches to his affidavit what purports to be Peeters' "narrative report," which is not signed by Peeters—or anyone at all—and does not look like an official police report. Rather, the report is simply typed paragraphs of text (which appears to be in a Word document) that is not on official letterhead, is not officially dated, and is not paginated. Because the majority fails to describe, let alone consider, the full scope of evidence presented in the Record, it is necessary to provide the full context of what occurred before reviewing whether the circuit court erred in granting the District's summary judgment motion.

## I. THE FULL RECORD AND CONTEXT

¶47    The majority glaringly omits many facts presented in the Record, particularly those that reflect favorably on Klosterman. This is particularly concerning given that this matter is here on appeal after a grant of summary judgment, which looks to whether any issues of material fact exist. *See* WIS. STAT. § 802.08(2). According to documents in the Record, Klosterman began teaching in

---

[9] The "report" is more akin to an informal summary log rather than an official police report.

[10] Former Superintendent Rieckmann, who was involved in the underlying district-level proceedings, resigned effective June 2019.

the District in August 2005. During Klosterman's first two years of employment, he received criticism for his discipline of "'difficult students[.]'"[11] After he was transferred from eighth grade to seventh grade, Klosterman enjoyed "nine years without any recorded incidents."[12] By many accounts,[13] he was a beloved teacher, coach, and mentor. The Record contains numerous examples of the praise and support Klosterman found within the Omro community:

- A close friend who coached basketball in Omro stated Klosterman "seemed to have an impact on each and every kid that he taught. All my players through the years had nothing but positive things to say about [him] and loved when he helped with the team[.]" He also said multiple students described Klosterman as their favorite teacher, and he described Klosterman as "loyal, dependable, honest, and kind."

- Numerous colleagues described Klosterman's positive impact on students, his ability to form strong student-teacher relationships, his positive mentorship, and his dedication to his work.

- One colleague described Klosterman as "the exact teacher I would want my children to have. His mix of care and dedication, charisma and outgoingness, drive and excitement are everything each and every student deserves to have in their classrooms." Another colleague described Klosterman as "genuinely caring and trustworthy" and "an honorable individual and a caring member of his community."

- A former middle school athletic director and science teacher described Klosterman as "a man of integrity" and wrote that she "was impressed with the knowledge, the creativity, and the passion [Klosterman] brought to [the teaching] team." She stated that

---

[11] Devi Shastri, *School leaders tried to let a beloved teacher go. Now, his supporters want them gone.*, OSHKOSH NORTHWESTERN (July 12, 2018), https://www.thenorthwestern.com/story/news/education/2018/07/12/omro-school-board-rehires-teacher-neil-klosterman-after-public-outcry-and-support/595330002/.

[12] *Id.*

[13] All of the individuals supporting Klosterman signed their names and did not request anonymity, but there is no reason to include their names for the purposes of this dissent.

"[s]tudents came first to [Klosterman], and he always was looking for ways to help our kids in every way possible. He truly inspired many of his colleagues to become better teachers by encouraging us to find new ways to do things, while respecting the things that were already in place." She also described Klosterman's passion for teaching and coaching, stating Klosterman "instilled so much confidence in all of the kids. His team building techniques and coaching strategies allowed each student to excel at their own pace. He showed the utmost respect for each and every student he encountered. I loved seeing their faces light up when they accomplished something new, and the gentle way that [he] encouraged them along the way." She "NEVER … felt uncomfortable with the way he interacted with his students."

- Multiple parents whose children were Klosterman's students praised his teaching skills, expressed gratitude for the positive impact Klosterman had on their children, and described him as a valuable member of the Omro community.

- Numerous former students recounted positive experiences in Klosterman's classroom and expressed gratitude for having had Klosterman as a teacher and coach.

- A former student confirmed he "never felt uncomfortable" with Klosterman and said students "chose to be in his classroom" because they "knew they would be safe and could rely on Mr. Klosterman to help and guide them in any situation." This student also recounted community events where Klosterman was "often surrounded by former students and players, along with their families" and said it was "difficult to see [Klosterman's] hard-earned reputation tarnished and his life turned upside-down due to the school district's actions[.]"

¶48 Despite the clear sentiment that Klosterman was a valuable member of both the Omro community and school district, conflicts arose during the 2016-17 school year, which Klosterman attributed to the new administration—specifically new superintendent Kelly Rieckmann. He alleges he was "unjustly reprimanded, and after a decade of having no disciplinary action, was written up in 2016." Parents and Klosterman's colleagues support the narrative that the new

superintendent "targeted" him, and one even suggested there was a "vendetta" against Klosterman.[14] One longtime colleague described the changes within the District when "a new administration" took over, stating it was his "personal perception" that the new administration's "focus was in emphasizing curriculum over the individual student[,]" which "appealed to a handful of teachers who found more satisfaction meeting curriculum design goals than doing the hard work of engaging a classroom of individual students, attempting to meet them where they were and helping each one flourish." He explained that as a result of these changes, "[t]he staff started to split into one of two camps; those of us who had strived to develop a child-centered school and those who favored a curriculum-based school." He believed that Klosterman's "refusal to lay down and accept what was happening at Omro" led to "this whole saga[.]"

¶49 In April 2018, the District decided it would not offer Klosterman a contract for the 2018-19 school year. It is unclear whether that decision arose at least in part from the Spring 2018 video showing Klosterman's interactions with a

---

[14] One set of parents, who saw Rieckmann's actions as "personal," said:

> We have been very troubled over the last 2 years watching the previous Superintendent and the Omro School District Board target [Klosterman] by tarnishing and ruining [his] reputation which he has so painstakingly built over decades.
>
> It is our sincere hope that the court realizes that there is no justification to keep Mr. Neil Klosterman from attending Omro School Functions where he can watch his former students grow into successful adults.

The former middle school athletic director and science teacher similarly said the "apparent vendetta against [Klosterman] was unfair, unjust, and has damaged his career[,]" and she believes Klosterman "was singled out and wrongly accused" and "was not treated equally amongst his peers" by Rieckmann.

student in the hallway; however, the District was certainly aware of the video as it had called on Peeters, a patrol officer at the time, to review it in Spring 2018. Although it appears Peeters did not draft a report related to his review of that video until he was again called on to investigate Klosterman in October 2018, Peeters' report stemming from the later investigation describes the Spring 2018 video. Specifically, he said the video shows Klosterman:

> [R]each[ing] down with both hands toward a male student sitting on the ground in the hallway. Klosterman then assisted this student to his feet and then quickly transitioned into Klosterman having his arms around the student's upper body as well as the neck and head region. They were very close together, as Klosterman and this young boy's body were touching. Their faces were very close and the video appeared as though Klosterman was kissing[15] this male student, however, the video was not definitive in that regard.

The report continues on to explain that Peeters identified the student, who explained that the incident related to him being poked in the eye during lunch or at recess and "that nothing inappropriate had happened between him and Mr. Klosterman." Peeters determined that no criminal violation had occurred.

¶50 When the community learned the Board decided not to offer Klosterman a contract for the 2018-19 school year, a large number of community members attended the May 2018 Board meeting to speak on Klosterman's behalf and convinced the Board to renew his contract. The community protested and marched in support of Klosterman with signs stating, "Save Mr. K.!" and "Keep

---

[15] The apparent "kissing" appears to be to the student's forehead or eye area. However, the Record contains only photos depicting screen shots, presumably from the video, with black circles superimposed over the student's face, which makes it difficult to determine this with any degree of certainty.

The Good Ones[.]"[16]  According to a newspaper article, "many residents and former students described [Klosterman] as a life-changing educator."[17]  "Several parents told the board their children specifically asked to get into 'Mr. K.'s' class.  One mother told the board Klosterman effectively saved her daughter's life."[18]  That mother, whose daughter suffers from anxiety and depression, said her daughter "'reads now instead of harming herself, because of Mr. Klosterman[.]'"[19]

¶51     The Board unanimously reversed its decision at the meeting and renewed Klosterman's contract for the 2018-19 school year[20]—despite the conduct observed on the Spring 2018 video.  At the same time, community members expressed discontent with Superintendent Rieckmann and "lined up to sign a petition calling for the superintendent's immediate resignation[,]" claiming Rieckmann was "'trying to rule by fear and intimidation[.]'"[21]  The petition had over 400 signatures as of July 2018, and the community members who were supporting Klosterman and who were unhappy with Rieckmann also started a Facebook page, which grew to over 800 members in July 2018.[22]

¶52     Shortly into the 2018-19 school year, however, the District placed Klosterman on paid administrative leave amid an investigation by Peeters, now the school resource officer, into concerns raised by an anonymous staff member who

---

[16]  Shastri, *supra* note 11.

[17]  *Id.*

[18]  *Id.*

[19]  *Id.*

[20]  *Id.*

[21]  *Id.*

[22]  *Id.*

thought it was inappropriate for Klosterman to socialize with his students at a September 7, 2018 high school football game and who did not like seeing Klosterman put his arm around a student's shoulder or hug students.

¶53 Ten days later, on September 17, 2018, Peeters spoke with Klosterman about his conduct at the football game. In his report, Peeters acknowledged that Klosterman "has a good rapport with the students and that many students and families like him and many students do like him as an effective educator" but that in Peeters' opinion, that good rapport can be "possible without the frequent physical contact[.]" Klosterman, who could not remember the specific incidents from the football game, told Peeters that at teacher orientation, the teachers "were advised how important physical contact is with students and that some students really needed [it.]" Peeters agreed with Klosterman that "physical contact with a student could sometimes be situational and depend on the context of the situation." Peeters admitted he "had only observed [Klosterman's] behavior from a distance and was not close enough to listen to any sort of conversations" and that he (Peeters) was "still learning [students'] faces and names[.]" It was during this conversation that Klosterman indicated he would not change his conduct. It is unclear whether anyone from the administration ever demanded that Klosterman refrain from all physical contact.

¶54 In October 2018, Peeters brought two families to the Omro Police Department for interviews during his investigation. According to Peeters' report, the first family expressed fondness for Klosterman and concern about the "animosity" "some members of the community" saw "between the School District Administration and Neil Klosterman." That family told Peeters their son confides in Klosterman, they were aware of the hugging, and that they had no issues with it. Peeters showed them a video of a hug between Klosterman and their son, and neither

parent saw anything improper. The mother told Peeters that in other cultures, this sort of physical contact is "completely normal and acceptable[.]" Peeters later discovered that Klosterman had taught for two years in Spain before coming to the Omro schools. Peeters also indicated in his report that the son, when questioned, did not report feeling uncomfortable with any of his interactions with Klosterman.

¶55 After the interview, this same mother sent the Omro administrators a letter expressing her concerns about Peeters and the interview itself.[23] She provided a description of what her son said in that interview that does not appear in Peeters' report and said she felt that Peeters had "an agenda when asking questions, and it was not to gather facts and information." She also said neither she nor her husband had any concerns with Klosterman's actions in the video or "with what we have witnessed in person as parents" and indicated that the questions asked of her son were "leading" and that "when the answers given didn't fit, the questions changed to try to get different answers." She went on to state that her "child's answers were honest and direct, and stated that he at no time felt uncomfortable in any situation with the staff member in question, nor any other staff member or coach, for that matter." She also questioned whether Peeters was "properly trained to work with children, teens, and young adults, both in regards to questioning them, and understanding their particular social and emotional developmental stages[.]"

---

[23] Given that this letter was sent in October 2018, it would appear likely that the Board had this information when it decided to continue the ban. Thus, even if this court was limited to reviewing the materials the Board considered when it made its decisions to continue the ban, the mother's concerns—particularly her disagreement with the District's portrayal of Klosterman's interaction with her son—are likely sufficient to raise an issue of material fact as to whether banning Klosterman was "reasonable to promote the cause of education[.]" *See* WIS. STAT. § 120.13.

¶56 The second family Peeters interviewed at the police station was the family of the student involved in the alleged knee touch and back-to-back contact.[24] The student denied having any physical contact with Klosterman besides "high 5's." Peeters' report indicates that when specifically asked about Klosterman cupping his knee, the student said Klosterman's hands were only on the desk and not his leg and that none of his interactions with Klosterman made him uncomfortable.

¶57 Peeters' report explains he also spoke with Patti Crump, a retired law enforcement officer who started a program for sensitive crime victims in Waushara County.[25] Peeters says: "I did share some of the circumstances with Patti and did express great concern by the behaviors that were described that have been exhibited by Neil Klosterman." According to Peeters, Crump "indicate[d] that many of [Klosterman's] behaviors … and the things he has said mirror other sexual offenders that she has investigated" and that Klosterman, who she appears to have neither met nor spoken with, "should not be around kids." It also does not appear that Crump ever spoke with any of the students or families identified in Peeters' investigation, and because the Record does not contain Crump's affidavit or formal statement, it is unclear what information Crump based her opinion on or whether Peeters' opinions and perceptions influenced her own.

¶58 Peeters' report also discloses that he reached out to Oshkosh Police Officer Deana Brandl, a forensic interviewer, and asked her to conduct interviews with a few Omro Middle School students. Peeters' report reflects that Brandl spoke

---

[24] Due to redacted student names throughout the Record, it is at times difficult to confirm which students were purportedly involved with the alleged physical touching incidents and whether certain references in Peeters' report pertained to the same student or different students. However, one of the anonymous staff member complaints said that he/she believed it "was the same male student" involved with both the knee touching and back-to-back contact.

[25] Omro is in Winnebago County.

with three students, one of whom said he was never at Klosterman's house and that although he reported having been "hugged or physically contacted about a dozen times … he was not uncomfortable." Another student said he had been to Klosterman's house but was never inside. A third student said he was paid ten dollars to mow Klosterman's grass. The third student had also done yard work for Klosterman—this student's mother was friends with Klosterman, and the mother and son had been at Klosterman's house together. The mother also left her son at Klosterman's house, and he "would play Fortnite in Klosterman's theater room."[26]

¶59 As part of his investigation, Peeters contacted Child Protective Services (CPS) to "inform them of everything that we had learned about and the *rumors* that we have heard and did explain the situation to them." (Emphasis added.) The parents who CPS contacted declined forensic interviews of their children, and CPS took no action. Peeters concluded his report by noting "no criminal violations have been alleged at this point" and closed the case. It is unclear what date the case was specifically closed, although the last date in the report is October 29, 2018.

¶60 During the course of the District's investigation, Rieckmann notified DPI, which required the District to send Klosterman's entire personnel file. DPI also contacted Klosterman and considered his version of events. Klosterman told DPI the following:

- "I have never engaged in any inappropriate relationship or immoral conduct with any student."

---

[26] Again, because the Record contains only a redacted copy of Peeters' "report," it is unclear exactly which students the report refers to in recounting the students' accounts.

- There were "four occasions where students came to my house for the purpose of doing yardwork" with "parental permission[.]"[27]

- "On at least two of those occasions, the mother of two of the students … was present."

- Three years ago, he hosted a pizza party with the freshman basketball team and their coach to watch the movie *Hoosiers*. Klosterman had coached most of those boys when they were in junior high. Permission slips were signed, and the "students' parents picked up and dropped off their sons from my house."

- He has "never been contacted by police or child protective services as part of any investigation into my interactions with students. No parent has ever communicated to me that they felt I had an inappropriate relationship with their child."

- He believes "the superintendent recommended me for nonrenewal due to my outspoken disagreement with administration regarding changes to the District's educational policies."

- He explained the discord taking place in the Omro community, including the turmoil between the community and the superintendent/administration.

DPI, after considering all of the evidence, concluded there was no basis to revoke Klosterman's teaching license.

¶61 Klosterman ultimately resigned in December 2018, and he has since requested that the Board lift the restrictions that were put in place during the District's October 2018 investigation. The Board has declined to lift the restrictions, both via an email dated January 2, 2019, and a letter from the Board president in July 2019. Neither denial relied on any statutes, let alone WIS. STAT. § 120.13's

---

[27] The majority references a student who "had been paid to mow Klosterman's lawn, did other work at Klosterman's home, and would be left at Klosterman's residence 'with Klosterman without any other adult supervision and would play Fortnite in Klosterman's theater room[,]'" Majority, ¶36, but the majority fails to explain why it seemingly believes this conduct supports its conclusion that banning Klosterman was "reasonable" as it relates to "promot[ing] the cause of education[.]" *See* WIS. STAT. § 120.13.

introductory language. The formal letter does not say the Board decided to retain the restrictions to "promote the cause of education," *see* § 120.13, or that Klosterman posed a danger to students. To the contrary, it says: "Allegations at the time involved concerns with your ability to follow District rules and directives. We believe that time is needed for the District to heal following those years of controversy. Maintaining the current directive to have you remain off premises is an effort to allow that healing process."

¶62 Klosterman asked the Board again in September 2019 to lift the restrictions, but the Board's attorney communicated the Board's denial in a September 30 letter, citing WIS. STAT. § 120.13 generally and § 120.13(35) specifically (a subsection that even the majority concludes does not provide authority here). The letter, noting that WIS. STAT. § 118.001 requires broad construction of these statutes, points to two school policies that the attorney believed warranted the continued unqualified ban. First, the letter cited the "School Visitors" policy, which allows it to "prohibit the entry of any person to a school or to expel any person" if "there is reason to believe" his or her presence "would be detrimental to the good order of the school" or request police assistance if someone "refuses to leave the school grounds or creates a disturbance[.]" Second, it cited and attached the "Spectator Conduct" policy, which it said requires "that spectators shall refrain from verbal or physical conduct that is disruptive and embarrassing to the students, the school district and the entire community." The letter explained that Klosterman's "conduct on school grounds in the past" violated both policies and "merit[ed] continued exclusion … from school property and activities." So, although the Board's lawyer, for the first time, cited to the statutes examined in this appeal, the Board's refusal to lift the restrictions relied on school policies that do not authorize continuance of the unqualified ban. The first policy addresses

18

presence in school buildings or disturbances requiring police assistance, and the second policy plainly relates to insisting that spectators, like the student participants, "display mature behavior and sportsmanship."

¶63    After repeatedly[28] asking the Board to allow him to come onto school property, specifically for sporting events, with no success, Klosterman filed suit against the District seeking a judgment that the District's restrictions violated his rights and enjoining the District from prohibiting him "from being lawfully on school grounds as any member of the public would be[.]"[29]   The Board filed a motion for summary judgment asserting the restrictions were lawfully imposed and that there were no genuine issues of material fact.   Klosterman opposed the summary judgment motion and filed multiple supporting affidavits.   Klosterman argued that summary judgment should be denied because the case involved many genuine issues of material fact.   He asserted the District "has violated his constitutional rights to be on the property and that there are no statutory or common law grounds for them to restrict him in such a matter."   The circuit court granted summary judgment for the Board, concluding the Board had the authority to continue the restriction under WIS. STAT. § 120.13 for the "good order of the school" and that no constitutional right "usurp[s] the authority of the School District[.]"

---

[28]   The majority says Klosterman never requested permission to come onto school grounds, and so we do not know whether his requests would be denied. Majority, ¶39.  But that is exactly what he repeatedly did by requesting that the Board remove the restrictions so he could come onto school grounds for sporting events, and we do know that every request was denied. There is nothing to suggest that, had Klosterman narrowed his request to a specific event on a particular date, it would have been granted.

[29]   Klosterman also filed a motion for injunctive relief, which the circuit court denied.

## II. DISCUSSION

### A. *Statutory authority and reasonableness*

¶64 The full text of WIS. STAT. § 120.13's introductory language provides as follows: "The school board of a common or union high school district may do all things reasonable to promote the cause of education, including establishing, providing and improving school district programs, functions and activities for the benefit of pupils, and including all of the following:[.]" After the colon, § 120.13 lists forty-five subsections across many pages—none of which authorize banning a community member from school property. Subsection (35), titled "Presence in school buildings[,]"[30] comes closest, but it covers only school *buildings* and addresses only rules related to people who "enter or remain in a [school] building."

---

[30] WISCONSIN STAT. § 120.13(35) provides:

PRESENCE IN SCHOOL BUILDINGS.

(a) A school board may adopt rules applicable to persons who enter or remain in a building operated by the school board, including requirements that such persons identify themselves and sign in when entering or remaining in the building or any specified portion of the building and designating time periods during which such persons may enter or remain in the building or any portion of the building.

(b) 1. Except as provided in subd. 2., any person entering or remaining in a building or portion of a building in violation of the school board's rules is subject to a forfeiture of not more than $1,000. Any person entering or remaining in a building or portion of a building in violation of the school board's rules under circumstances tending to create or provoke a breach of the peace may be fined not more than $10,000 or imprisoned for not more than 90 days or both.

2. Subdivision 1. does not apply to pupils, parents of pupils, school district employees or officials or agents of a certified or recognized representative of school district employees who are included in a collective bargaining unit.

The majority concedes the text of subsection (35) does not apply to the Board's actions banning Klosterman from school *grounds/property*. Majority, ¶23.

¶65    The concession that subsection (35) does not apply leads the majority to the introductory language of WIS. STAT. § 120.13—"reasonable to promote the cause of education" "for the benefit of pupils[.]" And, although these terms are not statutorily defined, the legislature identified many specific tasks authorized by the statute. Subsection (1), which addresses pupil suspension and expulsion rules, covers three and one-half pages in the statute book. Subsections (2) through (38) address insurance, contracts and leases, on-farm training to eligible veterans, books and equipment purchases, federal aid, teachers and administrators exchange program, funds for rewards, contracting with architects and engineers, food and legal services, employing nurses and dentists, historical records, prekindergarten classes, child care programs, special high school courses, paying school board membership fees, renting out school premises for non-school functions, acquisition of property, renewable resource facilities, establishing community programs and services, selling and purchasing property, providing free lectures for "adult residents of the school district[,]" leasing cable and data services, bonds, contracts with other governmental units, leasing school property, contracting for education services not available in the school, contracting for special education services and mental health, transportation of non-pupils and indigent pupils, designating records custodians, borrowing money, awarding credit for hunter education programs, school crossing guards, school board orientation, spending money, employing permit officers, leasing prekindergarten/kindergarten space, awarding high school diplomas to veterans, operating single-sex schools, and allowing hunting in school forests. *See* § 120.13(2)-(38). Conspicuously absent from this long list is a subsection banning

21

a law-abiding community member from entering school *grounds* indefinitely, at all times, regardless of whether students are present.

¶66     When interpreting statutes, we begin with the statutory language. ***State ex rel. Kalal v. Circuit Court for Dane Cnty.***, 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110. "'If the meaning of the statute is plain,'" we need not inquire further. ***Id.*** (citation omitted). "Statutory language is given its common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning." ***Id.***  We also interpret statutory language "in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes; and

reasonably, to avoid absurd or unreasonable results." *Id.*, ¶46. The majority decision does not even cite *Kalal* let alone apply *Kalal*'s analytical framework.[31]

¶67     Instead, the majority seizes on a few of WIS. STAT. § 120.13's introductory words and does not fully analyze the Board's authority under the statutes to do what it did here, and it is not necessary for me to do a full analysis either, because even assuming the statute provides the authority the majority says it does, and even assuming the Board's broad, indefinite restrictions do not infringe on constitutional rights, the Board nevertheless failed to show, as a matter of law, that banning Klosterman was "reasonable to promote the cause of education" when it refused to lift the restrictions. *See id.* The Board's refusal to lift the restrictions

---

[31] Instead of analyzing the statute, the majority relies on *Pritchard v. Madison Metropolitan School District*, 2001 WI App 62, ¶16, 242 Wis. 2d 301, 625 N.W.2d 613, a case where this court held the school district could authorize health insurance payments for unmarried partners of school district employees. *Pritchard*, however, relied on a specific subsection of WIS. STAT. § 120.13—subsection (33)—which authorizes "spend[ing] money as needed to meet the immediate expenses of operating and maintaining the public instruction in the school district." *Pritchard*, 242 Wis. 2d 301, ¶11 (alteration in original); *see also* § 120.13(33). No subsection in § 120.13 authorizes the restrictions imposed by the Board here. The majority also cites to the federal district court case *Anderson v. Hansen*, 489 F. Supp. 3d 836 (E.D. Wis. 2020), for the proposition that "no person has an absolute right to enter school property[.]" *Id.* at 845. *Anderson* does say that, but it was not a holding in that case and was further qualified. *Anderson* involved a parent who was banned from entering school property without first asking permission after the parent voiced concerns about the mask mandate at a school board meeting. *Id.* at 839. The court granted the parent's motion for injunctive relief, *in effect voiding the ban*, and permitting the parent "to access District property on the same terms and conditions that apply to all other members of the public who have children enrolled in District schools." *Id.* at 846. The court concluded that "forcing the plaintiff to obtain permission before entering school property is itself a form of irreparable harm" and that while, "as the defendants point out, *no person has an absolute right to enter school property*, parents are generally allowed to enter school property without first asking permission to do things such as pick up their children and attend recitals and school plays." *Id.* at 844-45 (emphasis added). That phrase, pulled out of *Anderson*, may be generally true, but it is not a holding, and Klosterman is not asserting that he has an absolute right to enter school property. He just wants to have the same rights that other members of the Omro community enjoy. Further, this court is not bound by decisions of the federal district courts. *State v. Mechtel*, 176 Wis. 2d 87, 95, 499 N.W.2d 662 (1993).

is either unreasonable as a matter of law, or the summary judgment materials create a genuine issue of material fact on the question.

¶68     Either way, the majority ignores the full context at play here and fails to identify sufficient evidence to explain how Klosterman's total banishment is "reasonable to *promote the cause of education*[.]"  *See **id.*** (emphasis added). Instead, in relying on case law not involving school boards and failing to meaningfully apply the summary judgment standard of review, it simply rubber-stamps the Board's decision.[32]   Even if I assume the majority's statutory interpretation is correct, there nevertheless must still be a reasonable connection between the restrictions and supporting the "cause of education[.]"  And, at the very least, this summary judgment record demonstrates that there are disputed material facts as to whether the Board's continued restrictions banning Klosterman are reasonable to promote the cause of education.

¶69     The majority certainly evokes strong emotions by suggesting Klosterman is a sexual predator who the Board must keep away from school grounds to protect Omro students.  Indeed, protecting students from pedophiles and criminals is something we all strive to do, and we likewise desire to provide children with a safe learning environment that ensures they are protected from adults who are

---

[32] The majority sanctions the Board's decision by citing to ***Klinger v. Oneida County***, 149 Wis. 2d 838, 844, 440 N.W.2d 348 (1989), which involved a county board of adjustment's findings of fact involving entirely different statutes from those governing the Board in this case.  The majority also relies on ***Tagatz v. Township of Crystal Lake***, 2001 WI App 80, 243 Wis. 2d 108, 626 N.W.2d 23, which involves statutes affording discretion to a town with respect to "whether it is in the public interest to build a road to a landlocked parcel."  ***Id.***, ¶1.  Neither case supports affording a school board discretion to take action beyond what is authorized by the statutes or the Constitution, and neither case requires this court to look the other way when a Board's actions violate either.

predators, criminals, or acting with intent to harm. We have many laws that are in place to afford those protections. *See* WIS. STAT. §§ 948.01-948.70.[33] Here, however, despite Peeters' apparently extensive and exhaustive investigation, the District could not locate a single student who felt uncomfortable receiving hugs or other physical contact from Klosterman. Not one. After teaching for thirteen years, no purported victim came forward to accuse Klosterman. There is no evidence any child was harmed. Nevertheless, the Board continues to prohibit Klosterman from coming onto school property open to the public based on a couple of anonymous staff member complaints that *they*—despite being unaware of any context, including whether Klosterman may have had personal relationships with a student and his family outside of school—felt uncomfortable seeing Klosterman hug some students or put his arm on their shoulder.

¶70 The majority says the record "was replete with evidence supporting the ban."[34] Majority, ¶33. Yet, the "evidence" it relies on all comes from the affidavit of Jay Jones—a person whose "only knowledge" of the situation comes

---

[33] WISCONSIN STAT. ch. 948, "Crimes Against Children," includes statutes regarding, inter alia, sexual assault (§ 948.02), child abuse (§ 948.03), mental harm (§ 948.04), sexual exploitation (§ 948.05), trafficking (§ 948.051), incest (§ 948.06), child enticement (§ 948.07), solicitation for prostitution (§ 948.08), child pornography (§ 948.12), and child neglect (§ 948.21).

[34] It is unclear from the majority opinion whether it limits its decision to the Board's *initial* imposition of the ban or whether it concludes that the Board's subsequent refusals to lift the ban years later are reasonable promotions of the cause of education. At this point, we should be focused on whether the Board's refusals to lift the restrictions are authorized and/or reasonable.

from "public outlets." What does that even mean?[35] The majority also relies on still images of the Spring 2018 video and dismisses Klosterman's explanation of his conduct because the Record does not show Klosterman provided his explanation about the student being "'poked in the eye'" to the Board.[36] *See* Majority, ¶33. But the student himself, who was the subject of the video, provided Peeters with the same explanation Klosterman provided—and the Board certainly had the *student's* explanation.

¶71 The majority also points to Peeters' observations at the September 2018 football game, in particular, a hand-holding exchange that Peeters saw as "more intimate." *See* Majority, ¶6. Yet, Peeters admits he observed only from a distance, could not hear the conversation or the context, and had no student describe Klosterman's contact as "intimate." The majority then points to the knee-cupping/back-to-back contact reported by an anonymous staff member, Majority, ¶12, which the student involved flatly denied. This appears to be the same student whose mother was friends with Klosterman, and she and her son spent time

---

[35] "Affidavits in support of a motion for summary judgment must contain evidentiary facts, *of which the affiant has personal knowledge*." **Hopper v. City of Madison**, 79 Wis. 2d 120, 130, 256 N.W.2d 139 (1977) (emphasis added) (citing **Kroske v. Anaconda Am. Brass Co.**, 70 Wis. 2d 632, 641, 235 N.W.2d 283 (1975), *superseded by statute on other grounds as stated in* **Mullenberg v. Kilgust Mech. Inc.**, 2000 WI 66, ¶¶13-14, 235 Wis. 2d 770, 612 N.W.2d 327). *See also* WIS. STAT. § 802.08(3) ("Supporting and opposing affidavits shall be made on personal knowledge and shall set forth such evidentiary facts as would be admissible in evidence.").

[36] Likewise, the majority dismisses Klosterman's explanation and simply says that regardless of "whether or not Klosterman had looked at the boy's eye at some point," the video shows Klosterman "engaged in physical contact with this student that is completely consistent with Peeters' reported description." Majority, ¶33. That may be true. But what the majority blatantly ignores is that context is important and that the physical contact here did not occur in a vacuum. While the context of this interaction—a student reporting being poked in the eye and a staff member thereafter checking the student's eye in response—may be inconvenient to the majority, the majority is nevertheless not entitled to ignore it.

*together* at Klosterman's house, and the mother clearly felt comfortable leaving her son there.[37]

¶72    The majority also cites to former Officer Crump's informal hearsay "opinion" Peeters recounted in his "report." In doing so, the majority ignores the informality of Crump's "opinion" or what the bases were for it. *See* Majority, ¶13. We do not know what information Peeters shared with Crump. There is no official report from Crump in the Record, and it does not appear that Crump ever met Klosterman or talked to him or any of the alleged victims or their parents. It is unclear what information Crump had or whether Crump's opinion was influenced by Peeters' opinions and perceptions. We have no affidavit or formal statement directly from Crump, nor do we have her curriculum vitae to even know the extent of her background and experience. And we do not know whether Crump was told that all the students who were hugged or otherwise had physical contact with Klosterman—and all their parents—found Klosterman's actions to be appropriate, welcome, and in no way problematic. Relying on Crump's offhand, casual, unsworn comments is not proper.

¶73    Additionally, the majority ignores the context surrounding the Klosterman investigation. Klosterman alleges he has never *inappropriately* touched a student, and there is much in the Record to support his position. Klosterman also alleges he was targeted not because of this physical contact but because he voiced his disagreement with the new administration, and evidence in the Record supports this assertion. Klosterman believes Rieckmann had a vendetta against him because it was Rieckmann's treatment of Klosterman that seemed to motivate the Omro

---

[37] Because the Record does not contain an unredacted copy of Peeters' report, this cannot be confirmed with certainty.

community to take action to remove Rieckmann. The July 2019 letter from the Board denying Klosterman's request to lift restrictions attributes the reason for the continued ban as "to allow … healing" of the conflict between Klosterman and the administration. Once attorneys got involved, however, the explanation shifted from "time … to heal" to Klosterman being "detrimental to the good order of the school" with reference to WIS. STAT. § 120.13.

¶74    The majority also ignores that Klosterman has not been charged with violating any laws, let alone been convicted of any crime related to the conduct at issue. And, at least two independent, neutral agencies—DPI and CPS—saw no basis to take action against Klosterman. If DPI, knowing all the facts, sees Klosterman fit to actually *teach*—to be alone in a classroom with students—how can it be reasonable to prohibit him from coming onto school grounds to attend public sporting events? How can the Board insist that keeping Klosterman off school property regardless of whether students are present promotes the cause of education when an independent agency saw Klosterman fit to teach?

¶75    Interestingly enough, the Omro School District apparently has less concern about registered sex offenders coming onto school property than it does about Klosterman because it imposes no restrictions on registered sex offenders "if the person will be on school grounds to vote in an election or to attend a non-school sponsored event occurring on the school grounds." In contrast, the total ban on Klosterman makes no exception for him to vote or be on school grounds for a "non-school sponsored event[.]" Moreover, according to the District's policies, any other time convicted sex offenders want to come onto school property, they need only *notify* the Superintendent that they are doing so:

**Sex Offenders on School Property**

> Any person that is a registered sex offender under Wisconsin Law is required to notify the Superintendent of the specific date, time and place of the person's visit to any school facility and must notify the Superintendent of his/her status as a registered sex offender.

Registered sex offenders do not need to *ask permission* to attend sporting events on school grounds; they must simply give notice of their intent to be present.

¶76 Similarly, under the same policy, the District does not restrict parents who are convicted sex offenders from entering school property; rather, those parents must simply notify the Superintendent at the beginning of each school year of their status:

> Parents of students enrolled in the District must notify the Superintendent of his/her status as a registered sex offender and that s/he has a child enrolled in the District. Notification must occur at the beginning of each school year or at the time the individual is required to register or whenever the child is first enrolled, whichever occurs first.

¶77 The majority says the Board acted reasonably to promote the cause of education because allowing Klosterman "'on school grounds would be detrimental to the good order of the school'" and "'unnecessarily expose students to potentially dangerous behavior.'"[38] Majority, ¶18. But the majority does nothing to connect

---

[38] Throughout its opinion, the majority largely analyzes the "reasonableness" of the Board's action with little direct reference to whether the Board's action was "reasonable *to promote the cause of education*" (emphasis added), as required by WIS. STAT. § 120.13. For example, the majority's only connection between the Board's action and the statutory requirement does not come until the penultimate paragraph where it states that based on Klosterman having hugged students and briefly held hands with a student, "the board *acted extremely reasonably* in instituting and maintaining the ban against Klosterman coming onto District property" because doing so, in light of Klosterman hugging students, would "promote the cause of education by keeping students safe." Majority, ¶38 (emphasis added). However, the question is not whether the Board's action was reasonable but whether the action was "reasonable to promote the cause of education," and the majority does nothing to explain *how* or *why* the ban keeps students safe under these circumstances. In light of the majority's failure to consider the entirety of the Record in favor of presenting only those facts from the Record that support its conclusion, it is unsurprising that it largely glosses over this required connection.

29

Klosterman's apparently welcomed, friendly hugs and arms around a shoulder to either good school order *or* danger. How does keeping Klosterman off of school property indefinitely and at all times—regardless of whether students are present—make education better for the students? The majority does not say.

¶78 Based on the information in the Record, Klosterman's conduct did not offend or upset Omro's student body, it did not cause disorder in the school, and it did not cause disorder at sporting events. No student reported being harmed or that he felt threatened or endangered by Klosterman's actions, nor did the parents of any of the students identified during the course of the District's investigation raise any such concerns. Rather, a few staff members felt uncomfortable, and Rieckmann apparently disliked Klosterman's personality. That does not make the Board's continued ban on Klosterman an act that is "reasonable to promote the cause of education," particularly approaching four years after it was first imposed. "Reasonable" is defined as "[f]air, proper, or moderate under the circumstances; sensible." *Reasonable*, BLACK'S LAW DICTIONARY (11th ed. 2019). "[P]romote" is defined as "to contribute to the growth or prosperity of[.]" *Promote*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/promote (last visited July 14, 2022). *See State v. Sample*, 215 Wis. 2d 487, 499, 573 N.W.2d 187 (1998) ("For purposes of statutory interpretation or construction, the common and approved usage of words may be established by consulting dictionary definitions.").

¶79 Put simply, it is undisputed that Klosterman hugged some of his students, put his arm around students' shoulders, and that he helped a student up off the floor and hugged him. He did those things—as many male teacher/coaches/mentors do with their male students/players, particularly in small towns where teachers may be personal friends with some families. Despite the

majority's suggestion, not all hugs (or other physical contact) are criminal, let alone sexual in nature.[39] *See* Joseph L. Daly et al., "*Gray Touch": Professional Issues in the Uncertain Zone Between "Good Touch" and "Bad Touch,*" 11 MARQ. ELDER'S ADVISOR 223, 232 (2010) (giving examples of good touch as: "the enthusiastic, encouraging coach hugging the student-athlete after a win in the track event" and "[t]he encouraging wrestling coach hugging and encouraging the young wrestler who has just lost a match is the kind of touch that every parent wants for his/her child.").

¶80 When the conduct forming the basis of the Board's decision to maintain the restrictions imposed upon Klosterman is viewed in its full context, rather than within the confines of the majority's cherry-picked version of events, the Board's statutory authority to impose such restrictions on a community member, assuming such statutory authority exists, cannot be seen, as a matter of law, as being "reasonable to promote the cause of education" under these circumstances. To conclude otherwise, as the majority does, leaves *any* adult who hugs a student or puts an arm around a student or holds a student's hands on school grounds at risk of being deemed a suspected sexual predator who poses a threat to the "promot[ion of] the cause of education[.]" *See* WIS. STAT. § 120.13.

### B. Constitutional claim

¶81 Both Klosterman and the Board address the constitutional issue: Klosterman alleges the ban violates his constitutional rights, and the Board argues that any constitutional interests Klosterman has are outweighed by the need to

---

[39] The majority, based primarily on a few complaints from Klosterman's colleagues, describes Klosterman's conduct as "*excessive* physical contact" and opines that "his refusal to abstain from" "full body hug[s/contact]" going forward "posed a *significant risk*"—both "physical and psychological"—to the student body. Majority, ¶38 (emphases added).

protect the health and safety of Omro students. The majority ducks the issue because it says Klosterman did not adequately describe which constitutional rights were implicated. Majority, ¶25 n.7. I agree Klosterman could have better identified the particular constitutional violations potentially involved here, but this court could have ordered supplemental briefing on the constitutional issue or held oral argument. We all took an oath to support the Constitution of the United States and the Constitution of the State of Wisconsin. We should have ordered additional briefing on the constitutional issues and/or held oral argument in this case.

### III. CONCLUSION

¶82    The majority concludes the Board has the statutory authority to continue its indefinite ban of Klosterman from school property and that the Board acted "reasonably" without properly connecting "reasonableness" to "promot[ing] the cause of education" as the text of WIS. STAT. § 120.13 requires. The majority renders its decision without a full analysis of the statutes involved, on limited facts, and without providing the full context—contrary to the summary judgment standard of review—and by relying on "evidence" derived from "public outlets" instead of personal knowledge. It also ignores Klosterman's constitutional claim.

¶83    Without question, school boards have been given broad discretion by the legislature. But even broad discretion has limits, both statutory and constitutional, and even assuming WIS. STAT. § 120.13 authorizes the Board's ability to ban community members from school property under certain circumstances, the summary judgment submissions do not demonstrate the Board is entitled to judgment as a matter of law. Rather, the summary judgment submissions either raise genuine issues of material fact that need to be resolved by a factfinder *or* show that continuing the Klosterman ban was not "reasonable to promote the

32

cause of education," making Klosterman entitled to the relief he requested as a matter of law. By failing to apply the summary judgment standard of review and limiting its review to the District's submissions, the majority improperly acts, as the circuit court did, as a rubber-stamp of the District's decision based on anonymous hearsay statements and inadmissible evidence. It is not the role of this court to decide whether we personally view Klosterman's physical affection for his students to be right or wrong. The court is tasked with deciding whether the statutes provide a school board with the authority to indefinitely ban someone from school property, and if so, whether the summary judgment submissions here raised a genuine issue of material fact as to the Board's actions. The majority failed to properly analyze the statute and failed to recognize that the summary judgment materials require reversal of the circuit court's order. I respectfully dissent.